F. E. KUEHL et al., Appellants, v. GEORGE MEANS et al., Appellees.

April 3, 1928.

Rehearing Denied September 28, 1928.

O. M. Brockett, for appellants.

W. C. Strock, Paul H. Cunningham, W. B. Sloan, and Joseph E. Defley, for George Means, appellee.

Evans, J.—The plaintiffs purport to have disaffirmed two contracts entered into on November 27 and November 29, 1917, respectively. It appears from the testimony of the plaintiffs that, shortly prior to November 27th, they entered into a mutual oral agreement, as between themselves, whereby they purported to go into business as a partnership, and engage in the sale of automobiles. At that time, plaintiff Lee Friar lacked four months of reaching his majority; Kuehl lacked eight months of reaching his majority; Stewart was 18 years of age. The homes of these boys were in Grimes, where they had graduated from high school together. Friar had attended college for one year thereafter, and had engaged more or less in various occupations. Kuehl and Stewart were attending Des Moines College, in Des Moines. Pursuant to their plans of "partnership," they conferred with their elders, with a view of securing the necessary

funds to carry out their plan. Stewart conferred with his mother, who signed a note for $1,000, in order to borrow that amount as capital for Stewart. Kuehl conferred with his uncle, who was president of a bank at Grimes, and who loaned to Kuehl $1,000 for the same purpose. Friar conferred with his father, but does not appear to have procured any money from him for his share of the capital. The money borrowed by Kuehl and Stewart was first placed to their credit in the bank at Grimes in separate accounts. Later, these two accounts were consolidated into one joint account, in the name of both persons. Later, Kuehl issued a check for $1,500, drawn on his own personal account, which was deposited in the Central State Bank, to the credit of the Liberty Sales Company. Kuehl and Stewart continued their attendance at school. Both testified that Friar was to look after the business. On November 27, 1917, Friar entered into a contract with E. A. Paul, an automobile salesman, which was as follows:

"This agreement and contract entered into this 27th day of November, 1917, between Lee A. Friar, party of the first part and E. A. Paul, party of the second part, both of Des Moines, Polk County, Iowa:

"Whereas, the said Lee A. Friar and E. A. Paul has entered into a contract for the selling of the Liberty car and such other items as are necessary to the success of said business, it is therefore understood as follows:

"The party of the first part agrees to furnish funds to carry on said business in a sum not to exceed five thousand ($5,000) dollars. Said funds are to be placed to the credit of the Liberty Sales Company in the Central State Bank of Des Moines, Iowa, and are to be drawn upon only in carrying on said business.

"The party of the first party further agrees to pay to E. A. Paul, party of the second part, the sum of one hundred ($100.00) dollars per month, payable monthly and one-third (1/3) of all the profits accruing to said Liberty Sales Company for the period of one (1) year from date of this contract. Said profits are to be figured and a division made every ninety days.

"The party of the second part does hereby agree to devote all his time and energy to the carrying on of said business; to maintain a set of books for the inspection of the said Lee A.

Friar at all times, and to use his best judgment at all times in making a success of the business.

"The above mentioned concern shall be known as the Liberty Sales Company, with offices at No. 1223 Locust Street, with Lee A. Friar as president and E. A. Paul as manager.

"I hereby agree to all the terms and conditions of the above contract.

"November 27, 1917.

"Lee E. Friar
E. A. Paul."

On November 29, 1917, Paul and Friar, acting in the. name of the Liberty Sales Company, entered into a so-called "Dealers Territory Agreement" with the Means Auto Company, whereby the dealers agreed to receive and pay for three cars per month, during December, January, and February, and to make certain deposits on each car in advance. This contract was signed as follows:

"Distributor's Signature    Means Auto Co.
                                    "By Geo. Means.
"Dealer's Signature    The Liberty Sales Co.
                    "By E. A. Paul, Lee E. Friar."

Pursuant to this contract, Paul and Friar signed a written order "addressed to Liberty Motor Car Company, Detroit," requesting shipment of "two five-passenger touring cars and one sedan, at sub-dealers discount 20%," and directing the addressee to "draw on Liberty Sales Co., through Central State. Bank." This was signed: "The Liberty Sales Co., per Lee E. Friar E. A. Paul." In December, 1917, two checks were drawn on the Central State Bank by the "Liberty Sales Company, by Mr. E. A. Paul, Mgr.," to the Means Auto Company, in payment for an automobile. On January 9, 1918, a letter of disaffirmance was served upon the defendant by the attorney of the three minors, which was as follows:

"Referring to your contract of November 29th last with the so-called Liberty Sales Company, and any business transactions that may have been done under that contract, this is to notify you that there is not and never has been any such firm or company as the Liberty Sales Company.

"It appears that three minor boys named Friar, Kuehl, and Stewart, had about that time partially matured some plans for undertaking to engage in the automobile business, but had not completed same when young Lee Friar of the trio, without the knowledge of the others, assumed to make the contract referred to with your firm. About the same time, it seems, he executed a brief instrument in writing with Mr. E. A. Paul, which provided for the services by the latter as a salesman in such contemplated business, although there is nothing on the face of it to show that anyone else than Lee E. Friar had any interest in such employment.

"It seems that your firm and Mr. Paul, together, have assumed to act under these instruments and to make sales of one or more automobiles by means of which transactions you and Paul together have secured a considerable amount of money from these young men.

"All the transactions in question are repudiated and rescinded by each of these three young men, and I am giving you this notice thereof upon the express authority of each of them and of their parents and natural guardians. You are warned not to proceed in any other transaction in reliance upon any of the matters referred to in this letter; and demand is hereby made upon you for the return of all money that you may have received from them, or either of them, either directly or indirectly."

Friar testified concerning the partnership as follows:

"The three of us had agreed to go in together, before I talked to any automobile man or made any real arrangement. Don't remember just all we said about amounts of money each should contribute, and about sharing losses and profits, but know they were mutually agreed before that time all right. We did not put it in writing, and consulted no lawyer. As far as I know, all the talk was had on the sidewalk. It seems to me that the first thing we did about carrying out our scheme after we had agreed, Stewart and I went up to see Peacock, of the Stevens car, at that time. * * * The paper marked by the reporter 'Exhibit A' is one of the original signed copies of that agreement. I told Paul, before he signed it, that the other two boys and I were to conduct the business proposed to be opened, *as partners*.

The reason I signed it personally was, I had been acting for the boys all the time.''

Kuehl testified as follows:

''We wanted to make a little money, if there was a chance to do it, and Lee says we could form a partnership and get the agency for some automobile in Des Moines and around Polk County, and maybe part of another county; and he says, 'You fellows don't need to quit school,—we will get started here, and I believe we can make some money.' Consequently, Stewart and I borrowed money from the bank up at Grimes, and we were not in a position to look up any deals; so we left it to Lee to make this deal where he seen best, and we would put in our time as we seen fit, and could apply it. Consequently, he told us, after we got together, that he finally started around and got this contract with Means. I mean Lee Friar told us that. Naturally, he was one that did the business with the others. We were just simply in the deal, and had the money to invest with it. * * *

''Cross-examination. I would say that this partnership arrangement was concluded maybe a month before this contract was signed. We were not necessarily to put in the same amount of money. We were to share according to the amount of money we put in.''

Stewart testified:

''Frank and I were rooming together, across the street west from Highland Park College, just north of Euclid; and he and Lee had talked about this once before, down town; and Frank mentioned it to me in the room, one time there,—said he thought we could make some money by getting an automobile agency.''

The foregoing is perhaps a sufficient statement of the details of the record to indicate the general character of the legal questions involved. The case has its confusions. One of these arises out of the certain declarations contained in the notice of disaffirmance. The averments of the petition, as well as the testimony of the plaintiffs, are contradictory to such notice in material respects. It will be observed that such notice declares that there ''never has been any such firm or company as the Liberty Sales Company;'' whereas the petition avers that the plaintiffs did enter ''into an oral agreement and understanding between

and among themselves, to engage in the automobile business in the city of Des Moines, Iowa, same to consist of buying and selling automobiles and accessories, each of said three parties agreeing to contribute capital to the enterprise;'' and that they ''undertook to engage in such business under the trade name and style of 'Liberty Sales Company.''' The notice of disaffirmance avers that Lee Friar, ''without the knowledge of the others, assumed to make the contract referred to with your firm;'' whereas the petition avers that, though the same contract ''purports to be signed only by the plaintiff Lee E. Friar and the said E. A. Paul, but that, as a matter of fact, it was also the contract of the minors F. E. Kuehl and S. E. Stewart;'' and again:

''That the said last described contract, though not signed by the minors F. E. Kuehl and S. E. Stewart, was, at the time, in fact their contract, as well as that of the plaintiff Lee E. Friar, the said Kuehl, Stewart, and Friar at that time all purporting to do business together under the name and style of 'Liberty Sales Company,' as hereinbefore stated.''

I. We consider first the question as to whether Lee Friar is entitled to any relief. He was the chief promoter of this enterprise. It was through his solicitations that the other boys  became interested in the same. The evidence would justify the finding that, as between themselves, these three young men agreed to become partners in this enterprise, the details of which were to be looked after by Friar. Pursuant to such arrangement, Friar entered into the contract with Paul, who was an automobile salesman of considerable experience. In entering into this oral agreement of partnership, and in entering into the written contract with Paul in the name of the partnership, and in entering again into the written contract with the Means Auto Company in the name of the partnership, and in ordering the cars and paying for the same by check on the partnership account, he might properly be deemed to be engaging in business, within the meaning of the statute. That such acts furnished a reason, within the meaning of the statute, tending to create a belief that he was competent as an adult, is quite manifest. He was, in fact, close upon his majority. He was an edu-

cated young man, with considerable business experience, and had the appearance of an adult, according to the evidence. Means did not know or suspect his minority. There is no evidence tending to show anything to the contrary. We think that, in the light of the whole record, the district court was justified in finding that the defendant did have good reason to believe him to be an adult, and that he did so believe.

Furthermore, the contracts of November 27th and November 29th which Friar purported to make on behalf of the Liberty Sales Company, as its president, were clearly a representation that the Liberty Sales Company was an entity capable of contracting.

There is a further reason, upon this record, which is quite conclusive against this plaintiff. At the time of the notice of disaffirmance, the Liberty Sales Company, of which Friar was in control, had on hand the automobile for which the checks were given. There was no offer to return such automobile, either in the notice of disaffirmance or otherwise. If it be thought that the minor was under no obligation to return the automobile at that time, because he was not yet of age, and if it be thought that he should return only such property as he had control of after he became of age, even so, this plaintiff was remiss at this point. Friar became of age on March 6, 1918. The evidence shows that the Liberty Sales Company had the automobile in question in its possession and control upon the Payne Motor Company's floor until May or June, 1918. True, it is claimed that Paul had it, and not Friar. But Paul was the mere employee of the company, and Friar was president, and was in control both of its property and of its employee. We hold, therefore, that Friar's contract continued in full force, and that he was not entitled to disaffirm the same.

II. We next consider what right has accrued to Kuehl and Stewart, as against Means. The question is not as to what rights they have against Friar, nor against Paul, nor against the Central State Bank. Nor is the question whether they could be made personally liable for the debts of the Liberty Sales Company. If Means were attempting to enforce the contract of the Liberty Sales Company against these minors, as members of a partnership, a very different question would be presented. The question in-

volved herein is whether these two minors, who were unknown to Means, as parties to the contract, may now insert themselves into such contract as the real parties in interest, and to the exclusion of the Liberty Sales Company, and thereby transform the contract of November 29th so as to make it a contract between Means and these minors, and not a contract between Means and the Liberty Sales Company. These two minors dealt with Friar, and with him alone. They did not deal with Means, nor was it known to Means that they had any interest in the Liberty Sales Company. They entered into a contract of partnership with Friar. This was their only contract. They could have disaffirmed their contract of partnership with Friar, and could have recovered from Friar all that they paid him. But they did not disaffirm their contract with Friar. They purported to disaffirm the contract of November 29th, entered into with Means by the Liberty Sales Company, through Friar as its president, and Paul as its manager. The contract of partnership with Friar was valid, under the statute, until disaffirmed. The Liberty Sales Company, therefore, was a legal entity on November 29, 1917, and it was competent to enter into the contract with Means. A partnership and its membership are not identical. If a partnership has a legal existence, any person may contract with it, even though he be ignorant of its membership. This partnership had a legal existence. Means dealt with it innocently and in good faith. Whereas, under the statute, a minor may disaffirm his own contract, we know of no rule of law or statute that would permit a minor to disaffirm the contract of a legally existing partnership, simply on the ground that he was a member of it.

Doubtless he may disaffirm such a contract, so far as his own personal liability is concerned. The right of a minor in such a case is personal. His right of recourse is against the party with whom he contracted. The right of a minor to pursue his property, upon disaffirmance, into the hands of a third party, may not be predicated upon the mere fact of his minority. Such right of pursuit must be predicated not only upon minority and disaffirmance, but upon some form of fraud chargeable to the third party. Where a minor parts with his property on a contract valid until disaffirmed, third parties becoming innocent purchasers thereof for value are entitled to protection, as such.

If a minor seeks recourse beyond the party with whom he contracts, he must connect such third party in some manner, by notice or otherwise, with the contract which he disaffirms.

The position of Kuehl in this case is that the $1,500 which was deposited in the Central State Bank to the credit of the Liberty Sales Company was the money of Kuehl exclusively. He testified that it was not even a part of the money deposited in the Grimes bank in the joint account of Kuehl and Stewart. The record justifies the finding that Kuehl did furnish this money to Friar in the form of his check, and that Friar deposited it in the Central State Bank to the credit of the Liberty Sales Company, with the knowledge and consent of Kuehl. Clearly, as between the partners, Kuehl was entitled to a credit for this amount. To say, however, that it was still Kuehl's money after it had been deposited in the bank to the credit of the Liberty Sales Company, is merely a legal conclusion. His case rests upon this predicate. The title to this money passed from Kuehl to Friar and the Liberty Sales Company. Upon deposit in the bank, the title to the money passed to the bank. It became debtor for the money, not to Kuehl, but to the Liberty Sales Company. When, on December 3, 1917, Friar drew the checks of the Liberty Sales Company upon the Central State Bank for $1,232, he drew upon the credit of the Liberty Sales Company. When the Central State Bank paid the check to Means, it properly charged the same to the account of the Liberty Sales Company. It was responsible to no one else. Means' contract was with the Liberty Sales Company; his delivery was to such Sales Company; payment *pro tanto* was received from such Sales Company. Neither Means nor the bank was required to look beyond such Sales Company for the source of the funds which purchased the credit at the bank. The fallacy in the position of this plaintiff is the assumption that his title to the money originally furnished by him continued in him throughout all its mutations. Such a pursuit could be made only by a suit in equity, to impress a trust upon the funds on grounds of fraud, actual or constructive. When, in such pursuit, the funds are found in innocent hands, the pursuit must cease, or turn its course toward the proceeds of such funds.

There is no suggestion in this record of fraud on the part either of the Central State Bank or of Means. It is very clear,

upon this record, that neither the bank nor Means had any knowledge of any infirmity in these transactions, or that these two minors had any interest in the firm. We are of opinion, therefore, that the district court properly dismissed the petition of this plaintiff. What we have said concerning Kuehl's claim is equally applicable to that of Stewart. There is the further infirmity in Stewart's case that it does not satisfactorily appear that any of his money was used by the firm. The claim for him is that $250 advance payment was made by Friar to Means, and that the necessary funds for this payment were drawn out of the joint account of Kuehl and Stewart in the Grimes bank. But the evidence of the plaintiffs themselves on this question is contradictory and inconsistent. Friar testified concerning this payment as follows:

"As I remember, I gave a check for the $250 payment mentioned in the Means contract, Exhibit B. Have tried to find the canceled check, but have failed. As I remember, it would have been drawn on the Grimes Savings Bank. I had an account on which that check was drawn. When it was opened, the deposit was $2,000. Stewart and Kuehl contributed that money, $1,000 each."

Means denied that he ever received such payment. The plaintiffs were unable to produce any check therefor. The account, being a joint account in the name of Kuehl and Stewart, would require a check signed by them. But it does not appear that they issued any joint check or checks on that account. As to the item of $250, we think the plaintiffs failed in their proof that Means ever received the same. It further appears that Stewart drew $155 by check from Friar on the Central State Bank. This was in the latter part of December, and shortly before the disaffirmance. The claim of Stewart, therefore, is of less merit than that of Kuehl.

The following authorities bear upon the questions above discussed: *Jaques v. Sax,* 39 Iowa 367; *First Nat. Bank v. Casey,* 158 Iowa 349; *Kemp v. Cook,* 18 Md. 130; *Folds v. Allardt,* 35 Minn. 488 (29 N. W. 201).

The decree of the district court is—*Affirmed.*

All the justices concur.